699 S.E.2d 157

**The STATE, Petitioner,**

v.

**Marlon RIVERA, Respondent.**

No. 26877.

Supreme Court of South Carolina.

Heard April 8, 2010.

Decided Sept. 7, 2010.

Rehearing Denied Oct. 7, 2010.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Robert Mills Ariail, of Greenville, for Petitioner.

Chief Appellate Defender Robert M. Dudek, of South Carolina Commission on Indigent Defense, of Columbia, for Respondent.

Chief Justice TOAL.

In this case, the Court granted a writ of certiorari to review the court of appeals' decision in *State v. Rivera,* Op. No.2008–UP–187 (S.C. Ct.App. filed March 18, 2008).

### FACTS/PROCEDURAL BACKGROUND

At about 12:30 a.m. on July 18, 2005, law enforcement officers were called to the scene of a shooting outside a Greenville, South Carolina night club. Upon arrival, the officers found Wilfredo Solis Monge (Victim), lying on the ground. Victim was transported to the hospital, placed on life support, and later died.

Investigators interviewed witnesses at the scene of the shooting. One witness, Alvaro Fernandez (Fernandez), told police that the shooter, Marlon Rivera (Respondent), was at The Mexicali, a nearby night club. Officers went to The Mexicali with Fernandez, who identified Respondent. Officers arrested Respondent.

## Investigation

During the investigation of this matter, Respondent and multiple witnesses gave conflicting and inconsistent statements concerning the events surrounding the shooting of Victim. First, while at the station the night of the shooting, Fernandez told police he saw two men arguing and a third man standing nearby. The third man, according to Fernandez, reached down and grabbed something at his leg. Fernandez heard two shots fired, but did not see who fired the weapon.

Second, Nelson Castro (Castro) told police that Respondent came to his house immediately after the incident and admitted to shooting Victim. Castro said Respondent told him he got in a fight in which he struggled over his gun with the person whom he was fighting. During this struggle, Respondent told Castro, the weapon accidentally discharged, striking an onlooker.

Finally, Respondent gave a confession to police the night of his arrest in which he admitted to shooting Victim. Respondent claimed that Victim harassed him for hanging out with African–Americans, grabbed his shirt, and the two began to fight. Respondent admitted he was mad because Victim harassed him and confessed that he pulled a gun from his pant leg. According to Respondent, he dropped the gun, picked it up, and shot at Victim two times.[1]

---

1. Specifically, Respondent said:

   This guy that I know but is not my friend approached me and asked me why I was hanging around with those black people. He then grabbed my shirt and started pushing me around. We struggled for a little bit. Finally the guy let go of me. I was mad because he hit me. I went to grab my gun but [it] fell down my pant leg. The gun fell on the ground and I grabbed it. I pointed it at him and shot two times. One of my friends said "Ok, you already shot him, let's go." ... A little while later the police came and arrested me.

*Trial*

At trial, the State presented its case, including the above evidence. The defense presented several witnesses who told additional, conflicting versions of the events surrounding the shooting of Victim. First, Courtney Robles (Robles) testified that she witnessed a fight between two men that was broken up by a third man. The man who broke up the fight took a gun from one of the men involved, pointed it in the direction of one of the men in the fight, and fired. The bullet, she testified, struck Victim who was an onlooker not involved in the fight. Robles stated that she did not know the identities of the men involved.

Second, Norberto Ortiz (Ortiz) testified on behalf of the defense. Ortiz said that Respondent and Delman Mauricio Arias (Arias) were kicked out of the bar after they became unruly. Once outside, Arias attacked Respondent, who fired his weapon into the ground in order to intimidate Arias. Then, another onlooker took the weapon from Respondent and shot in the direction of Arias. Finally, Respondent regained control of the weapon and fired another shot into the ground. At this time, according to Ortiz, the men realized that Victim, an onlooker, had been shot.

Third, Respondent took the stand and testified in his defense. Contrary to his confession, Respondent testified he shot his weapon into the ground in an attempt to scare Arias, who had attacked him. Further, Respondent stated that a third man grabbed the gun and shot at Arias. Respondent testified he then grabbed the weapon and shot at the ground. Respondent said he only fired the weapon because he wanted to scare Arias away. On cross examination, Respondent admitted he and Arias were simply fighting and he did not think Arias was going to kill him.[2] Respondent did not suffer serious injuries in the fight.

---

2. The following colloquy occurred:

Prosecution: You didn't think the person you were fighting with was going to kill you, did you?
Respondent: I didn't think ...
Prosecution: Just fighting?
Respondent: Yes. He was just fighting and he was kicking me.
Prosecution: So just a typical fist fight to start with?

Defense counsel requested a charge on involuntary manslaughter, arguing that the jury could find from the evidence that Respondent lawfully armed himself in self-defense and shot his weapon with no intent of harming anyone. The trial court denied defense counsel's request, questioning the lawfulness with which Respondent was armed.

Respondent was convicted of murder and sentenced to thirty years imprisonment. The court of appeals reversed, finding that the trial court's failure to charge the jury as to involuntary manslaughter was error and prejudiced Respondent. Specifically, the court of appeals found that while there were several inconsistent explanations for the fatal shot, viewing the evidence in the light most favorable to Respondent, Castro's testimony supported a jury finding the weapon discharged during a struggle between Respondent and another party over the weapon. The court of appeals also found that Respondent's admission that he fired the gun towards the ground was evidence of recklessness in the absence of self-defense.

## ISSUE

This Court granted a writ of certiorari and the State presents the following issue for review:

Did the court of appeals err in finding Respondent was entitled to a jury instruction on involuntary manslaughter?

## ANALYSIS

■ The State argues the court of appeals erred because Respondent's brandishing of a weapon was unlawful conduct naturally tending to cause death or great bodily harm, thus he was not entitled to a charge on involuntary manslaughter.[3] We agree.

---

Respondent: He hit me hard. And he just [threw] me to the ground. And he was even on the ground just hitting me some more, kicking me.

3. The State presents three specific arguments in support of its general thesis that the court of appeals erred in finding that Respondent was entitled to a charge on involuntary manslaughter. First, the court of appeals erred because Respondent's brandishing of a weapon was unlawful conduct naturally tending to cause death or great bodily harm. Second, assuming *arguendo* Respondent was lawfully armed,

██ The law to be charged must be determined from the evidence presented at trial. *State v. Knoten*, 347 S.C. 296, 555 S.E.2d 391 (2001). Where there is evidence from which the jury could infer that the defendant committed a lesser offense, the trial judge must submit the lesser-included offense to the jury. *State v. Brown*, 360 S.C. 581, 602 S.E.2d 392 (2004); *State v. Hill*, 315 S.C. 260, 433 S.E.2d 848 (1993).

██ Involuntary manslaughter is defined as: (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Mekler*, 379 S.C. 12, 15, 664 S.E.2d 477, 478 (2008).

Respondent argues that sufficient evidence exists in the record from which a jury could find that Respondent was guilty of the second form of involuntary manslaughter: the unintentional killing of another while recklessly engaged in a lawful activity.[4] Respondent argues that he was in lawful possession of a firearm because he was acting in self-defense.[5]

the court of appeals erred because it went too far in "cherry picking" facts from disparate accounts of the incident to synthesize a defense theory that would justify a jury charge on involuntary manslaughter. Third, assuming *arguendo* Respondent was lawfully armed, the court of appeals erred because, under the facts of this case, an intentional firing into the ground would not support involuntary manslaughter. We find no evidence in the record to suggest that Respondent was lawfully armed in self-defense. Thus, the State's second and third arguments are moot.

4. Because the death at issue here occurred as a result of the discharge of a firearm, there is no evidence in the record to support a jury charge on the first theory of involuntary manslaughter: the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm.

5. The elements of self-defense are:
First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circum-

However, Respondent admitted at trial he was not in imminent fear of death or serious bodily injury.[6]  Thus, the trial judge concluded that Respondent was not acting in self-defense and refused to charge the jury on those grounds.  We agree with the trial court's conclusion and find that there is no evidence in the record indicating that Respondent was acting in self-defense.  Thus, Respondent was not entitled to a charge on involuntary manslaughter.  *See State v. Reese*, 370 S.C. 31, 36, 633 S.E.2d 898, 901 (2006) (finding that, in the absence of self-defense, pointing and presenting a firearm precludes an involuntary manslaughter charge).

## CONCLUSION

There is no evidence in the record to support the conclusion that Respondent was lawfully armed, thus we reverse the decision of the court of appeals.

KITTREDGE, J., and Acting Justice James E. Moore, concur.  BEATTY, J., dissenting in a separate opinion in which PLEICONES, J., concurs.

Justice BEATTY.

I dissent.  The majority reverses the opinion of the Court of Appeals which held that the trial court erred in refusing a requested jury instruction on involuntary manslaughter.  The majority reasons there is no evidence of self defense; therefore, Rivera did not arm himself lawfully and, as a result, a jury instruction on involuntary manslaughter was not warranted.

---

stances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life.  Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.  If, however, the defendant was on his own premises he had no duty to retreat before acting in self-defense.  *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984).

**6.** Contrary to the dissent's suggestion, nothing in the record supports a finding that Rivera armed himself in self-defense.

The record in this case is replete with testimony that Rivera was the victim of an unprovoked physical attack by Delman Mauricio Arias. The testimony also indicates that although Rivera had the gun on his person he did not present it until after he was beaten, knocked to the ground, and repeatedly kicked. Even then, the gun was unintentionally presented when it fell down Rivera's pant leg and onto the ground resulting in a scramble for the gun between Rivera and Arias. Rivera testified that he got control of the gun and fired it into the ground when Arias continued to advance. Furthermore, in response to the solicitor's question concerning why Rivera pulled the gun, Rivera testified "The truth is that I did it just because I was nervous and because somebody was hitting me, beating me." In my view, there is no question that there is evidence that Rivera lawfully armed himself in self defense.

The majority appears to infer that Rivera had no right to arm himself in self defense because he *may* not have believed that Arias was going to kill him. I can find no support for this position in our jurisprudence. What a person believes to be the threat level of bodily harm is irrelevant *if* the actual threat of imminent serious bodily harm is present. It is axiomatic that circumstances indicative of serious bodily harm or the imminent threat thereof yields the right to self defense and the right to arm oneself accordingly. *See State v. Slater*, 373 S.C. 66, 69–70, 644 S.E.2d 50, 52 (2007) ("To establish self-defense in South Carolina, four elements must be present: (1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, *or* he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life; and (4) the defendant had no other probable means of avoiding the danger." (emphasis added)).

Being repeatedly beaten about the head and body, thrown to the ground, and repeatedly kicked constitute circumstances that give rise to the right to arm oneself in self defense. The law does not require a person to submit to a physical beating and to refrain from defending himself until the beating results in serious injury.

Moreover, the Court of Appeals opined an involuntary manslaughter instruction was required because there was testimony that the gun accidentally fired during a struggle for the gun. Not only is there evidence in the record to support that finding, but this Court's jurisprudence supports an involuntary manslaughter charge on similar facts. *See, e.g., State v. Light,* 378 S.C. 641, 664 S.E.2d 465 (2008) (finding the defendant, who was convicted of murder, was entitled to a jury charge on involuntary manslaughter where the defendant was lawfully armed in self-defense, the defendant negligently handled the weapon prior to the shooting, and the defendant and the victim struggled over the weapon); *State v. Crosby,* 355 S.C. 47, 584 S.E.2d 110 (2003) (holding the trial judge erred in refusing to charge involuntary manslaughter where there was evidence that the defendant did not intentionally discharge the weapon given the defendant claimed he was trying to break up a fight between three women, one of whom was the victim's girlfriend, and the victim charged at the defendant prior to the shooting with his hands behind his back); *State v. Burriss,* 334 S.C. 256, 513 S.E.2d 104 (1999) (concluding the defendant, who was convicted of murder, was entitled to an involuntary manslaughter charge where there was evidence from which the jury could have inferred that the defendant was lawfully armed in self-defense given: the defendant, after being attacked and pushed to the ground by the victim and another man, pulled his weapon; the defendant fired twice in the ground, causing both assailants to back away; and the defendant grabbed the gun and accidentally fired the fatal shot when one of the assailants advanced toward him).

PLEICONES, J., concurs.