THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2),
SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 The State, Respondent,
 v.
 Jose Herrera, Appellant.
 
 
 

Appeal From Beaufort County
 G. Thomas Cooper, Jr., Circuit Court Judge

Unpublished Opinion No. 2011-UP-354
Heard April 4, 2011  Filed June 30, 2011   

AFFIRMED

 
 
 
 Chief Appellate Defender Robert M. Dudek, of Columbia, for Appellant.
 Attorney General Alan Wilson, Chief Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Anthony Mabry, all of Columbia; and
 Solicitor Isaac McDuffie Stone, III, of Beaufort, for Respondent.
 
 
 

FEW, C.J.: On September 16, 2006, Katherine Herrera was shot in the back of her head.  Investigators found her dead on the floor beside the
toilet in her home with her pants down and toilet paper still in her hand.  Jose Herrera, Katherine's husband, was arrested three days later and eventually
convicted of murder and possession of a weapon during the commission of a violent crime.  The trial court sentenced him to life for murder and five years
for the gun possession charge.  On appeal, Herrera challenges the trial court's denial of his request to charge the jury on involuntary manslaughter and
accident and the admission of photographs of holes in the walls of his home.  We affirm. 
FACTS
During the two days following Katherine's death, Herrera relayed three different versions of events to investigators. 
1.    Herrera's First Version of Events
Corporal Rhett Parnell of the Beaufort County Sheriff's Office was among the first police officers to arrive at Herrera's house and speak to him on the day
of the murder.[1]  Herrera told Parnell that he left home to go to the store and that when he returned, he
discovered his wife "was deceased" in their bathroom.  He also gave a consistent written statement, in which he explained that he called 911 and
got Madison, Katherine's daughter, out of the home. 
Captain Robert Bromage, also of the Beaufort County Sheriff's Office, listened to a recording of Herrera's 911 call.  He "found it suspicious"
that Herrera "mentioned that it was a small caliber pistol that inflicted the wound to his wife and she was deceased."  At the scene, Herrera
told Bromage that he came back from the store and "looked around for a little bit, and then found her in the bathroom, and then noticed . . . a small
caliber gunshot wound."  Bromage took Herrera into custody and spoke to him again that night at the Bluffton Police Station where he repeated that he
discovered Katherine dead in the bathroom.
2.    Herrera's Second Version of Events
Two days later, on September 18, 2006, Bromage spoke with Herrera again at the Beaufort County Law Enforcement Center.  Bromage informed Herrera that
the police found a box of ammunition in the woods and showed him a picture of the gun that was found.[2]  At
this point, Herrera changed his explanation of what happened.  Herrera said that he and Katherine were arguing and she became angry when he told her he
wanted to leave.  According to this version of events, Katherine grabbed Herrera's pistol and pointed it at her head.  Herrera explained, "I went
to reach for it.  When I reached up to get it, [it] just accidentally shot itself."  He said, "She pointed at her head . . . .  That's
when I went in because I didn't want my wife doing anything like that.  I love my wife.  She--when I reached in, she let go of it.  When she let
go, I guess my hand went on the trigger."  Herrera said he "panicked" and called 911 and threw the gun away.  He told Bromage that the
shooting "was not intentional." 
3.    Herrera's Third Version of Events
Later in the afternoon on September 18, 2006, Bromage interviewed Herrera a third time.  In this interview, Herrera relayed a third version of
events.  Herrera explained, "I just wanted to scare her.  It was an accident, sir.  I didn't mean it."  He said Katherine pushed
him and tried to hit him.  "And that's when it pissed me off.  And I did grab the pistol."  Herrera said he "went in [the
bathroom] to try to scare her."  He testified, "And I slipped. . . .  I slipped, my hand hit her shoulder or something.  And that's
when the trigger went off." 
As Herrera continued to go over what happened, the story evolved.  He explained that he tripped on Katherine's legs.  He told Bromage, "That's
when I just grabbed the pistol[3] and just (inaudible) get her off my back.  And that's when I just fired. 
Just like I said, I tripped and it fired. . . .  I fired it."  Later in the conversation, Herrera told Bromage "my mind went blank to a
certain extent that I didn't quite remember. . . .  I know I fired it because it was in my hand the last time I remember it."  He explained,
"I tripped over her and (inaudible) and that's when the gun went off."  Herrera testified, "It might not have even been her feet. 
Might have been my kitten. . . .  I know I tripped over something."  He repeated this version a final time, and this time said, "And I just
walked in there (inaudible) and fired the pistol." 
LAW/ANALYSIS
I.    Jury Charge
Herrera requested that the trial court charge the jury on voluntary manslaughter, involuntary manslaughter and accident.  Herrera contends the trial
court erred in failing to charge involuntary manslaughter and accident.  We disagree.     
Involuntary manslaughter is the unintentional killing of another without malice and while engaged in either (1) an unlawful act not amounting to a felony[4] and not naturally tending to cause death or great bodily harm or (2) a lawful act with reckless disregard for the
safety of others.  State v. Light, 378 S.C. 641, 647, 664 S.E.2d 465, 468 (2008) (internal citations omitted); Burris, 334 S.C. at 265, 513
S.E.2d at 109 (1999).  For a homicide to be excusable on the ground of accident, it must be shown the killing was unintentional, the defendant was acting
lawfully, and due care was exercised in the handling of a weapon.  Burris, 334 S.C. at 259, 513 S.E.2d at 106 (citing State v. Goodson, 312
S.C. 278, 280, 440 S.E.2d 370, 372 (1994)).
As to involuntary manslaughter, the trial court explained,

 [I]t seems to me that either pointing or presenting a loaded or unloaded firearm is a violation of the statute.  As a matter of fact, it's a
 felony.  And the involuntary charge is defined as the killing of another without malice and unintentionally while engaged in either an unlawful act not
 amounting to a felony  which we don't have here  or an unlawful act with reckless disregard.  I mean, involuntary is the killing of another almost
 like an accident.

As to accident, Herrera argued "that he tripped.  So there's evidence in the record that the jury could find it was an accident, and that [he is]
entitled to an accident charge."  Herrera argued that he was lawfully in possession of the gun in his own home pursuant to Burris.  The
trial court ruled:

 The facts are so much different than Burris than they are here, not that that is dispositive.  But Burris is a self-defense case. 
 And self-defense is not an unlawful act.  And Burris possessed a pistol in that case.  And I just think that is not what we have here.  Here we
 have a pointing and presenting, regardless of how the defendant characterizes it, which is a felony.  . . .  I think this case needs to go to the
 jury on murder and voluntary manslaughter and that's it; and that's the way I so rule. 

During the charge conference, Herrera and the State both limited their arguments to Herrera's third version of events to determine what the jury should be
charged.  Based on our review of the record, we conclude that the trial court considered only the third version of events and not the first two versions of
events.  Thus, the third version of events served as the sole basis for the trial court's ruling. 
Herrera now points to the second version of events in support of his argument that evidence in the record supports charging involuntary manslaughter and
accident.  However, because Herrera never argued either his first or second version of events as a basis for the requested jury charges, the judge never
ruled on these grounds.  We find that it was incumbent upon Herrera to make the legal arguments that the first and second versions of his statement should
have been considered to preserve the issue for appellate review.  Objections should be made to the trial court in a "sufficiently specific manner that
brings attention to the exact error" and failure to properly object results in a procedural bar from raising the issue on appeal  See State
v. Johnson, 363 S.C. 53, 58-59, 609 S.E.2d 520, 523 (2005) (internal citations omitted).  Further, a party may not argue one ground at trial and
an alternate ground on appeal.  State v. Dickman, 341 S.C. 293, 295, 534 S.E.2d 268, 269 (2000).  We find that this issue is not preserved for
our review.
II.    Admission of Photographs
The State introduced several close-up photographs of holes in the walls of Herrera's home, which the State argued demonstrated "the force used to make
the holes."  The trial court ruled that the photographs were admissible as evidence of a "previous quarrel" to demonstrate that animus
probably existed between the parties.  Captain Bromage testified about his observations of the crime scene and explained that he "noticed holes in the
wall that were obviously suspicious."  He also testified, "I told [Herrera] there were signs of domestic violence all over the house.  And I
asked him where the holes came from. . . .  He said it came from before . . . ."
"The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed
only upon a showing of an abuse of discretion."  State v. Shuler, 353 S.C. 176, 184, 577 S.E.2d 438, 442 (2003).  We find that it was
within the trial court's discretion to admit the photographs as evidence of a previous quarrel between Katherine and Herrera.  See State v.
Braxton, 343 S.C. 629, 636, 541 S.E.2d 833, 836-37 (2001) ("In homicide cases, evidence of previous quarrels and ill feelings is admissible to show
that animus probably existed between the parties at the time of the homicide."). 
AFFIRMED.
THOMAS and KONDUROS, JJ., concur.

[1] Herrera was not in custody during this conversation.
[2] Herrera's neighbor testified that she found a box of bullets on her side of the fence about five feet away
from the fence surrounding Herrera's yard.  Sergeant Jeff Lauver, a K-9 officer with the Beaufort Sheriff's Office, testified that his search dog found a
weapon near Herrera's home. 
[3] Herrera admitted to throwing the gun "between the Y area in the road" where the police recovered
it.  He also admitted that he threw the bullets "behind the shed." 
[4] Some recent cases have not included the phrase "not amounting to a felony" from this element of
involuntary manslaughter.  See, e.g., State v. Gibson, 390 S.C. 347, 356, 701 S.E.2d 766, 771 (2010); State v. Rivera, 389 S.C. 399,
404, 699 S.E.2d 157, 159 (2010) (citing State v. Mekler, 379 S.C. 12, 15, 664 S.E.2d 477, 478 (2008), which does not include the phrase but cites State
v. Burris, 334 S.C. 256, 264, 513 S.E.2d 104, 109 (1999), which does include the phrase); State v. Wharton, 381 S.C. 209, 216, 672 S.E.2d 786, 789
(2009); State v. Brayboy, 387 S.C. 174, 180, 691 S.E.2d 482, 485 (Ct. App. 2010);.