757 S.E.2d 737

The **STATE**, Respondent,

v.

**Julian Deandre BATTLE**, Appellant.

Appellate Case No. 2011–203746.

No. 5222.

Court of Appeals of South Carolina.

Heard Feb. 4, 2014.

Decided April 23, 2014.

Rehearing Denied May 22, 2014.

112

Appeal from Greenville County, C. Victor Pyle, Jr., Circuit Court Judge.

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Alphonso Simon, Jr., all of Columbia; and Solicitor W. Walter Wilkins, III, of Greenville, for Respondent.

GEATHERS, J.

Appellant Julian Deandre Battle appeals his conviction for murder, arguing the trial court erred in (1) refusing to charge the jury on involuntary manslaughter, and (2) charging the jury that it could consider evidence of Appellant's flight in determining his guilt. We reverse and remand for a new trial because there is evidence to support an involuntary manslaughter charge.

## FACTS/PROCEDURAL HISTORY

On December 25, 2009, Appellant attended a gathering with a few relatives and friends—some of whom invited guests of their own, such as Rafael Dodd (Victim)—at the Park West Apartments in Greenville, South Carolina. During the gathering, an argument began between two of the attendees. Appellant attempted to end the argument; however, in doing so, Appellant became involved in an altercation with Victim. During the scuffle, Victim was fatally shot. None of the witnesses to the altercation saw the weapon that was fired.

At trial, Appellant testified as to what transpired during his altercation with Victim. According to Appellant, Victim approached him in an aggressive manner and proceeded to push him and brush up against him. Appellant asserted he "told [Victim] to keep his hands off of me," and Victim responded by pulling out a gun. Appellant then described the struggle that ensued:

Q: When Mr. Dodd pulled out the gun, what did you do?

A: I grabbed his right hand and I twisted his other hand.

Q: Why did you grab his right hand?

A: Because that's the hand that he had his gun in.

Q: Why were you trying to grab the gun?

A: I was trying to get it away from me. I was trying to get it away from his face and it was pointed towards me and my cousin.

Q: What happened after you tried to grab the gun?

A: I twisted and the gun went off.

Q: Did you intend to pull the trigger to that gun?

A: No, I did.[1]

Q: Did you intend for that gun to go off?

A: No, I didn't.

Appellant testified he "never actually grabbed the gun." However, he indicated his hand may have touched the trigger. Throughout his testimony, Appellant maintained he was not carrying a gun on the night of the shooting, and Victim was shot with his own gun.

Appellant's cousin, Clintonian Dupri Owens, corroborated Appellant's testimony that Victim was the aggressor and initiated the altercation. Additionally, Owens claimed that while Appellant was out on bond, Appellant told him "[Victim] pulled a gun out and [Victim] wanted to shoot him so [Appellant] turned [the gun] around and that was it." Owens testified he did not know Appellant to carry a gun. The State subsequently called Owens's girlfriend, Mikeya Shumate, as a witness. Shumate claimed she observed Appellant carrying a gun on another occasion; however, she admitted she did not see a gun on Appellant on the night of the shooting.

Iona Ooten, a forensic officer with the Greenville County Forensic Division, testified that when she arrived at the crime scene, she found Victim lying on the ground wearing a holster and also found a .45 caliber firearm lying next to his body.[2] Ooten stated no other firearms were found at the crime scene, nor were any bullet fragments or cartridge casings. Ooten also testified she was unable to find any fingerprints on the firearm, magazine, or any of the bullets because it had been raining heavily that day.

1. There are numerous typographical errors throughout the trial transcript. Based on Appellant's subsequent testimony, this answer appears to be a typographical error.

2. At the time of his death, Victim was carrying a valid Tennessee Handgun Permit in his wallet.

Investigator Laura Jones testified she interviewed Appellant shortly after his arrest. She explained that Appellant refused to write a statement, but permitted her to take notes as he described the incident to her. She read aloud her notes, which indicated: "[Victim] put the gun in my face.... I grabbed it and turned it back towards him. [Victim] pushed me with his right hand. We struggled and I don't know if I pulled the trigger or not. It went off and I dropped the gun." Investigator Jones testified she was present when the firearm found at the crime scene was unloaded. She described the firearm as being capable of holding seven bullets total when fully loaded. According to Investigator Jones, it would be "physically impossible" to add additional rounds to the firearm "without breaking the spring [inside the magazine]." Investigator Jones stated she believed the firearm found at the crime scene was not the murder weapon because it was "fully loaded." However, she admitted she did not have the firearm tested to verify whether or not it had been fired on the night of the shooting.

James Armstrong, who was qualified as a firearm's expert, testified the firearm recovered from the crime scene had a maximum capacity of six rounds in the magazine, plus an additional round in the chamber. He indicated the firearm was fully loaded with "brass case hollow point projectile[s]." Armstrong explained that wounds from a hollow point projectile are generally identifiable because the projectile is designed to hit a target and then stop and expand as it transfers energy to the target.

Dr. Michael Ward, chief medical examiner for Greenville County, testified he did not find any projectiles or bullet fragments in Victim's body. Dr. Ward indicated he was not able to determine the caliber of bullet that killed Victim. However, he explained that it was "[u]nusual, but certainly possible" for a hollow point projectile to travel through the human body without leaving any fragments behind.

At the close of the case, Appellant requested a jury instruction on involuntary manslaughter. Appellant argued that pursuant to *Casey v. State,* 305 S.C. 445, 409 S.E.2d 391 (1991), and *State v. Light,* 363 S.C. 325, 610 S.E.2d 504 (Ct.App.2005) (*Light I* ), *rev'd on other grounds,* 378 S.C. 641,

664 S.E.2d 465 (2008) (*Light II*), a charge of involuntary manslaughter was warranted because there was evidence of a struggle over the gun. The State argued this case did not involve a "true struggle" because Appellant successfully managed to grab Victim's hand and point the gun back at Victim. The trial court declined to charge involuntary manslaughter.

The trial court ultimately charged the jury on murder, voluntary manslaughter, self-defense, and accident. The jury convicted Appellant of murder and possession of a weapon during the commission of a violent crime. The trial court sentenced Appellant to life imprisonment for the murder charge and five years' imprisonment for the weapons charge.

## STANDARD OF REVIEW

 "Generally, the trial judge is required to charge only the current and correct law of South Carolina." *State v. Brown*, 362 S.C. 258, 261, 607 S.E.2d 93, 95 (Ct.App.2004). "To warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.* at 262, 607 S.E.2d at 95.

## LAW/ANALYSIS

### I. Involuntary Manslaughter Charge

Appellant argues the trial court erred in refusing to charge the jury on involuntary manslaughter in light of his testimony that Victim was shot while the two men struggled over Victim's gun. We agree.

 "Involuntary manslaughter is defined as (1) the unintentional killing of another without malice but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice but while engaged in a lawful activity with reckless disregard for the safety of others." *State v. Mekler*, 379 S.C. 12, 15, 664 S.E.2d 477, 478 (2008). "Involuntary manslaughter is a lesser included offense of murder only if there is evidence the killing was unintentional." *Tisdale v. State*, 378 S.C. 122, 125, 662 S.E.2d 410, 412 (2008). "Evidence of a struggle between the defendant and the victim over a weapon supports submission of an involuntary manslaughter charge." *Id.*

 "The law to be charged must be determined from the evidence presented at trial." *State v. Rivera,* 389 S.C. 399, 404, 699 S.E.2d 157, 159 (2010). "In determining whether the evidence requires a charge on a lesser included offense, the court views the facts in a light most favorable to the defendant." *State v. Brayboy,* 387 S.C. 174, 179, 691 S.E.2d 482, 485 (Ct.App.2010). "A trial court should refuse to charge the lesser-included offense of involuntary manslaughter *only* where there is no evidence the defendant committed the lesser offense." *Mekler,* 379 S.C. at 15, 664 S.E.2d at 479 (emphasis added).

Appellant cites *Light II,* for the proposition that his testimony, by itself, was sufficient to warrant an involuntary manslaughter charge. He submits that because South Carolina applies an "any evidence" standard, it is irrelevant that there was conflicting evidence showing Victim's gun was not the murder weapon. On the other hand, the State contends the instant case is distinguishable from *Light II* because it involves a struggle over a weapon that was not used in the killing. Moreover, the State cites to both *Tisdale* and *Casey* as further support that evidence of a struggle will only support an involuntary manslaughter instruction if the struggle was for control over the murder weapon.

In *Casey,* 305 S.C. at 446, 409 S.E.2d at 391–92, the defendant accidentally shot the victim while struggling with a third person over a gun. Our supreme court noted that it had previously recognized evidence of a struggle between only the defendant and the victim as sufficient evidence for submission of an involuntary manslaughter instruction to the jury. *Id.* at 447, 409 S.E.2d at 392. Nevertheless, the court concluded, "This principle is no less applicable where the defendant, in struggling with a third person over a gun, shoots the victim." *Id.* In reaching this conclusion, the court iterated the standard for submission of an involuntary manslaughter instruction to the jury as follows: "It has long been the law in this State that 'to warrant the court in eliminating the offense of manslaughter it should very clearly appear that there is *no evidence whatever* tending to reduce the crime from murder to manslaughter.'" *Id.* (quoting *State v. Norris,* 253 S.C. 31, 35, 168 S.E.2d 564, 565 (1969)).

Subsequently, in *Light II*, our supreme court cited *Casey* to support its holding that Light was entitled to a charge of involuntary manslaughter. 378 S.C. at 649, 664 S.E.2d at 469. Therein, Light gave "inconsistent" accounts of the events that led to his girlfriend's death. *Id.* at 648, 664 S.E.2d at 468. Light initially claimed he emerged from the bathroom in his home to find his girlfriend holding a rifle, and the rifle discharged when he tried to distract his girlfriend by swinging his left arm to get the rifle out of her hand. *Id.* at 644, 664 S.E.2d at 466. Light later changed his story, admitting he took the rifle from his girlfriend before it was fired. *Id.* At trial, Light testified he became scared when his girlfriend pointed the rifle and screamed at him, so he tried to knock the rifle away with his left hand. *Id.* at 645–66, 664 S.E.2d at 467. He further testified that after he jerked the rifle away from his girlfriend, he stumbled back several feet and the rifle accidentally discharged. *Id.* at 646, 664 S.E.2d at 467. Contrary to Light's testimony, the State's pathologist opined that the victim's wounds were consistent with a purposeful shooting and inconsistent with an accidental shooting. *Id.* at 645, 664 S.E.2d at 467.

In spite of Light's conflicting stories and the pathologist's testimony indicating the killing was intentional, the supreme court in *Light II* concluded there was evidence to support a charge of involuntary manslaughter. *Id.* at 648–49, 664 S.E.2d at 468–69. The court first found there was evidence Light recklessly handled the gun and, therefore, was guilty under the definition of involuntary manslaughter—a lawful act with reckless disregard for the safety of others. *Id.* at 648, 664 S.E.2d at 468–69. The court explained "according to [Light's] testimony, [he] took the loaded gun from [the victim] who was threatening him with it," and "[the gun] fired almost immediately after he took possession of it." *Id.* at 648, 664 S.E.2d at 469. Second, relying on *Casey*, the court found an involuntary manslaughter charge was appropriate given the fact Light struggled with the victim over the weapon. *Id.* at 648–49, 664 S.E.2d at 469.

Similarly, in *Tisdale*, 378 S.C. at 126, 662 S.E.2d at 412, a post-conviction relief case, our supreme court concluded counsel was ineffective for failing to request an involuntary manslaughter charge. Therein, Tisdale claimed the victim, who

was a passenger in Tisdale's vehicle, pulled out a gun and shot at him when he refused to drive the victim to a particular destination. *Id.* at 124, 662 S.E.2d at 412. Tisdale testified that when he saw the victim pull the gun, he struggled with the victim for control of the weapon. *Id.* He asserted that while he and the victim were struggling, the gun accidentally went off while in the victim's hand. *Id.* A pathologist testified there were two bullet wounds to the left side of the victim's head slightly behind the ear. *Id.* at 125 n. 2, 662 S.E.2d at 412 n. 2. The PCR court found trial counsel was not ineffective for failing to request a charge on accident or involuntary manslaughter, reasoning the fact the victim was shot twice in the back of the head was completely inconsistent with either accident or involuntary manslaughter. *Id.* at 125, 662 S.E.2d at 412. On appeal, our supreme court rejected this reasoning, stating: "The fact that Victim's wounds may have been inconsistent with petitioner's testimony that the gun fired while in Victim's hand is not overwhelming evidence that petitioner intentionally killed Victim." *Id.* at 126, 662 S.E.2d at 412. The court further determined Tisdale's testimony that there was a struggle between him and the victim was sufficient to support the submission of the involuntary manslaughter charge to the jury. *Id.* at 125–26, 662 S.E.2d at 412.

The above-cited cases establish that evidence of a struggle over the murder weapon supports submission of an involuntary manslaughter charge to the jury. The instant case is slightly distinguishable because it involves a dispute as to whether the struggle was for control of the actual murder weapon. However, our jurisprudence makes clear that when determining whether a charge on involuntary manslaughter is proper, the trial court must look to the presence of evidence, not its weight. *See Casey,* 305 S.C. at 447, 409 S.E.2d at 392 (stating a charge on involuntary manslaughter is only properly refused when there is "*no evidence whatever* tending to reduce the crime from murder to manslaughter"); *State v. Funchess,* 267 S.C. 427, 430, 229 S.E.2d 331, 332 (1976) (stating "the [p]resence of evidence to sustain the crime of a lesser degree determines whether it should be submitted to the jury." (citing *State v. Hicks,* 241 N.C. 156, 84 S.E.2d 545, 547 (App.1954))). The task of determining the weight of the evidence lies within the exclusive province of the jury. *United States v. Scheffer,*

523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ("A fundamental premise of our criminal trial system is that the *jury* is the lie detector." (citation and quotation marks omitted)); *State v. Smith,* 363 S.C. 111, 115, 609 S.E.2d 528, 530 (Ct.App.2005) (stating "the weight of the evidence is a question for the jury"). Consistent with these principles, our supreme court has determined there was sufficient evidence to warrant an involuntary manslaughter charge in situations where the appellant's version of events seemed improbable and there was conflicting evidence showing an intentional killing. *See Light II,* 378 S.C. at 645, 648, 664 S.E.2d at 467, 468–69 (holding an involuntary manslaughter charge was warranted where petitioner testified he took the gun from the victim's hands and, immediately thereafter, the gun went off even though petitioner had "inconsistent stories," and the pathologist testified victim's wounds were "consistent with a purposeful shooting"); *Tisdale,* 378 S.C. at 125–26, 662 S.E.2d at 412 (holding an involuntary manslaughter charge was appropriate where there was evidence petitioner and victim struggled for control of the gun despite "[t]he fact that victim's wounds may have been inconsistent with petitioner's testimony"). Therefore, in spite of the unique circumstances presented in the instant case, the focus of our inquiry remains the same—whether there was *no* evidence tending to reduce the crime from murder to manslaughter.

At trial, Appellant testified that he and Victim struggled for control of Victim's gun, and that Victim was ultimately shot and killed by his own gun. Appellant's testimony was contradicted by two witnesses who indicated the gun discovered at the crime scene next to Victim's body was fully loaded. However, this contradictory testimony was not overwhelming evidence that Appellant intentionally killed Victim considering no test was performed to confirm whether the gun was ever fired that night, no bullet fragments or projectiles were recovered during the investigation, and none of the witnesses present during the altercation saw the gun fire. Therefore, Appellant's testimony that he struggled with Victim over the murder weapon was sufficient evidence to support a charge of involuntary manslaughter. Moreover, there was evidence Appellant recklessly handled the gun because, according to Appellant's testimony, his hand may have touched the trigger as

he struggled for control over the gun. *See Light II,* 378 S.C. at 648, 664 S.E.2d at 469 (holding the petitioner was entitled to a charge on involuntary manslaughter because there was evidence showing the petitioner recklessly handled the gun, where petitioner testified that the gun fired almost immediately after he grabbed the gun from the victim). In light of this evidence, we find the trial court erred in refusing to instruct the jury on involuntary manslaughter.

 Although the trial court erred in refusing to instruct the jury on involuntary manslaughter, such error is subject to a harmless error analysis. *See State v. Middleton,* 407 S.C. 312, 317 n. 2, 755 S.E.2d 432, 435 n. 2 (2014) (holding a trial court's refusal to give a jury charge on a lesser-included offense that is supported by the evidence is subject to harmless error analysis). "When considering whether an error with respect to a jury instruction was harmless, we must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.'" *Id.* (quoting *State v. Kerr,* 330 S.C. 132, 144–45, 498 S.E.2d 212, 218 (Ct.App.1998)). "In making a harmless error analysis, our inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered." *Id.* (citation omitted). "Thus, whether or not the error was harmless is a fact-intensive inquiry." *Id.*

In *Middleton,* the appellant deliberately drove up to a stopped vehicle and shot at the two passengers at least five times. *Id.* at 314–15, 755 S.E.2d at 433–34. None of the bullets struck the passengers because one of them jumped into the driver's seat and ran the appellant off the road. *Id.* However, one of the passengers sustained a few cuts from the broken glass. *Id.* The appellant was charged with two counts of attempted murder and one count of possession of a weapon during the commission of a violent crime. *Id.* The trial court charged the jury on the lesser-included offense of assault and battery in the first degree as to the injured passenger, but refused to charge the lesser-included offense as to the uninjured passenger. *Id.* at 315, 316, 755 S.E.2d at 434. On appeal, our supreme court found "[t]he trial judge misconstrued the statutory definition of assault and battery in the first degree as requiring an injury to the victim." *Id.* at 315–

16, 755 S.E.2d at 434–435. However, the court found the trial court's refusal to give an instruction on the lesser-included offense was harmless error because "the only conclusion established by the evidence is that Appellant was guilty of attempted murder." *Id.* at 318–19, 755 S.E.2d at 436.

 Unlike *Middleton*, the evidence in the present case does not support one clear-cut conclusion. As noted above, there was conflicting evidence as to whether Victim was shot during a struggle over the murder weapon. Testimony from two witnesses indicated the gun discovered next to Victim's body was fully loaded and, consequently, was not the murder weapon. However, no bullet fragments or projectiles were recovered during the investigation and none of the witnesses present during the altercation actually saw the gun that was fired. Moreover, Appellant testified he was unarmed on the night of the shooting. According to Appellant, Victim initiated the altercation, and when Victim drew his gun, a struggle ensued, resulting in Victim being shot by his own weapon. Appellant's testimony, if believed, points to the killing being unintentional. Therefore, we cannot construe the evidence in this case as only showing Appellant intentionally killed Victim. Accordingly, we find the trial court's refusal to charge involuntary manslaughter was not harmless beyond a reasonable doubt.

## II. Charge on Flight as Evidence of Guilt

 Appellant also asserts the trial court erred in charging the jury that it could consider evidence of flight in determining his guilt. Although our determination concerning the trial court's refusal to charge involuntary manslaughter is dispositive of this appeal, we note that Appellant did not preserve his argument regarding flight as evidence of guilt. At trial, it was the State that objected to the trial court's instruction on flight. Appellant did not join in the State's objection; instead, Appellant argued the instruction was proper. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693–94 (2003) (holding an issue must be raised to and ruled upon by the trial court to be preserved for review); *id.* at 142, 587 S.E.2d at 694 (stating a party may not argue one ground at trial and an alternate ground on appeal).

## CONCLUSION

For the foregoing reasons, Appellant's conviction and sentence are

## REVERSED AND REMANDED.

FEW, C.J., and SHORT, J., concur.